**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

TILL METRO ENTERTAINMENT, d/b/a
The Vanguard, individually and on behalf
of all others similarly situated,

       Plaintiff,

v.

COVINGTON SPECIALTY INSURANCE
COMPANY, a New Hampshire Stock
Company,

       Defendant.

Case No. 20-CV-255-GKF-JFJ

## OPINION AND ORDER

Before the court is the Motion for Judgment on the Pleadings [Doc. 27] of defendant
Covington Specialty Insurance Company (Covington). For the reasons set forth below, the motion
is granted.

### I. Background

This is an insurance coverage dispute arising from the COVID-19 pandemic. On June 4,
2020, plaintiff Till Metro Entertainment, d/b/a The Vanguard (Till Metro), brought this putative
class action against its insurer, Covington. [Doc. 2]. On July 28, 2020, Till Metro amended its
complaint. [Doc. 6]. Attached to the First Amended Complaint is the relevant insurance policy.
[Doc. 6-1]. Covington moves for judgment on the pleadings, arguing it has properly denied
coverage for losses caused by COVID-19 and the resultant government closure orders. [Doc. 27].

### II. Allegations of the First Amended Complaint

The First Amended Complaint contains the following allegations. Till Metro owns and
operates The Vanguard, a concert venue located in Tulsa, Oklahoma. [Doc. 6, p. 1, ¶ 1]. Till Metro

was forced to suspend or reduce business at The Vanguard due to COVID-19 and the resultant closure orders issued by the City of Tulsa and State of Oklahoma. [*Id.*, pp. 2, 7 ¶¶ 8, 31].

Covington issued an insurance policy to Till Metro for a policy period of May 25, 2019 to May 25, 2020. [*Id.*, p. 4, ¶ 17]. Till Metro has performed all its obligations under the policy, including paying premiums. [*Id.*, ¶ 18]. Till Metro submitted a claim for loss under its policy due to the presence of COVID-19 and the resultant government closure orders. [*Id.*, p. 8, ¶ 41]. Covington denied that claim. [*Id.*]. Till Metro asserts nine (9) causes of action individually and on behalf of others similarly situated:

- Count I: Breach of Contract – Business Income Coverage
- Count II: Breach of Contract – Civil Authority Coverage
- Count III: Breach of Contract – Extra Expense Coverage
- Count IV: Breach of Contract – Sue & Labor Coverage
- Count V: Declaratory Judgment – Business Income Coverage
- Count VI: Declaratory Judgment – Civil Authority Coverage
- Count VII: Declaratory Judgment – Extra Expense Coverage
- Count VIII: Declaratory Judgment – Sue & Labor Coverage
- Count IX: Breach of Covenant of Good Faith and Fair Dealing

[*Id.*, pp. 14-26].

## III. Insurance Policy

The insurance policy, attached as Exhibit A to the First Amended Complaint, contains the following relevant provisions.[1]

---

[1] "When a complaint includes an attached exhibit '[the exhibit's] legal effect is to be determined by its terms rather than by the allegations of the pleader.'" *Brokers' Choice of America, Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017) (quoting *Droppleman v. Horsley*, 372 F.2d 249, 250 (10th Cir. 1967) (alteration original)).

# BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM

\* \* \*

## A. Coverage

### 1. Business Income

\* \* \*

We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

\* \* \*

### 2. Extra Expense

\* \* \*

**b.** Extra Expense means necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

\* \* \*

### 3. Covered Causes of Loss, Exclusions And Limitations

See applicable Causes of Loss form as shown in the Declarations.

\* \* \*

### 5. Additional Coverages

#### a. Civil Authority

\* \* \*

When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises, provided that both of the following apply:

**(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and

**(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

\* \* \*

## C. Loss Conditions

\* \* \*

### 2. Duties In the Event of Loss

**a.** You must see that the following are done in the event of loss:

\* \* \*

**(4)** Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

\* \* \*

## F. Definitions

\* \* \*

**4.** "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

\* \* \*

# CAUSES OF LOSS – SPECIAL FORM

* * *

## A. Covered Causes of Loss

When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy.

## B. Exclusions

**1.** We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

* * *

**l.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **l.**, does not apply to damage to glass caused by chemicals applied to the glass.

* * *

## G. Definitions

* * *

**2.** "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

* * *

## EXCLUSION OF PATHOGENIC OR POISONOUS BIOLOGICAL OR CHEMICAL MATERIALS

This endorsement modifies insurance provided under the following:

## COMMERCIAL PROPERTY COVERAGE PART

The following exclusion is added:

We will not pay for loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogenic or poisonous biological or chemical materials. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

However, if both A. and B. below apply, we will pay for such loss or damage subject to the terms of Paragraph A. Coverage, 4. Additional Coverages, d. Pollutant Clean-up and Removal in the attached coverage form:

A.      The pathogenic or poisonous biological or chemical materials are normally kept at or brought onto your premises, with your consent, for use in your business operations at your premises; and

B.      The discharge, dispersal, seepage, migration, release, escape or application of the pathogenic or poisonous biological or chemical materials is accidental and is not the result of a willful or malicious act against any persons, organizations, or property of any nature.

## IV.  Legal Standard

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings. Courts reviewing such motions "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012). The motion "should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Id.*

A defendant's motion for judgment on the pleadings under Rule 12(c) is subject to the same standard applicable to a Rule 12(b)(6) motion to dismiss. *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1223 (10th Cir. 2009). Thus, the court can "consider documents attached to or referenced in the complaint if they are central to the plaintiff's claim and the parties do not dispute the documents' authenticity." *Brokers' Choice*, 861 F.3d at 1103 (internal quotation marks omitted). The insurance policy attached to the First Amended Complaint is such a document.

Accordingly, the court will consider the policy without converting the instant motion into a Rule 56 motion for summary judgment. *See* Fed. R. Civ. P. 12(d).

"In Oklahoma, interpretation of an insurance contract is a matter of law." *Boggs v. Great Northern Ins. Co.*, 659 F. Supp. 2d 1199, 1204 (N.D. Okla. 2009) (citing *Max True Plastering Co. v. U.S. Fidelity and Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996)). Oklahoma's general principles of contract interpretation govern the construction of an insurance policy. *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla. 1991). The terms of a contract are construed according to their plain meaning and any ambiguities will be "construed liberally in favor of an insured and strictly against the insurer." *Cont'l Cas. Co. v. Beaty*, 455 P.2d 684, 688 (Okla. 1969). However, courts should not create an ambiguity in the policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision." *Wynn v. Avemco Ins. Co.*, 963 P.2d 572, 575 (Okla. 1998). A policy term will be considered ambiguous only if it is susceptible to more than one reasonable interpretation. *Max True*, 912 P.2d at 869. Oklahoma courts "will not impose coverage where the policy language clearly does not intend that a particular individual or risk should be covered," and neither a "split in authority over whether a certain term is ambiguous," nor "the fact that the parties disagree" alone is sufficient to establish an ambiguity. *BP America, Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.3d 832, 835-36 (Okla. 2005).

"When policy provisions are unambiguous and clear, the employed language is accorded its ordinary, plain meaning; and the contract is enforced carrying out the parties' intentions." *Id.* at 835. "The general declaration of insurance coverage, as established by the insurance policy and limited by its provisions, normally determines the insurance carrier's liability, and the insured's respective rights under the contract by identifying what risks are covered and excluded by the policy." *Boggs*, 659 F. Supp. 2d at 1205 (quoting *Dodson*, 812 P.2d at 377).

## V. Analysis

Covington argues it is entitled to judgment on the pleadings for three reasons. First, Till Metro has not pleaded any facts which, if true, would establish that its property suffered a direct physical loss resulting in physical damage to or alteration of the property necessitating repairs. Covington argues this is a prerequisite to coverage under the policy. Second, the policy contains a exclusion for loss or damage caused by pathogenic materials, and the COVID-19 virus is, in Covington's view, a pathogenic material. Third, the policy contains a pollutant exclusion and the COVID-19 virus is, according to Covington, a pollutant as that term is defined in the policy.

### A. Coverage

Till Metro alleges that it is entitled to Business Income, Extra Expense, and Civil Authority coverage for losses caused by COVID-19 and the resultant government closure orders.[2] Covington disagrees.

### 1. Business Income and Extra Expense Coverage

To trigger Business Income coverage, Till Metro must allege "direct physical loss of or damage to property." [Doc. 6-1, p. 33]. Extra Expense coverage has a similar requirement: "Extra Expense means necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no **direct physical loss** or damage to property caused by or resulting from a Covered Cause of Loss." [*Id.* (emphasis added)].

---

[2] Till Metro also alleges it is entitled to "Sue and Labor" coverage. [Doc. 6, p. 6, ¶ 28]. The "Sue and Labor" provision appears in the "Loss Conditions" section of the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM as a duty of the insured, Till Metro, in the event of loss. [Doc. 6-1, p. 37]. The provision provides that the insured must "[t]ake all reasonable steps to protect the Covered Property from further damage, and keep a record of [its] expenses necessary to protect the Covered Property, for consideration in the settlement of the claim." [*Id.*]. "[T]his provision is plainly not a coverage provision." *Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191, 1206 (D. Kan. 2020).

In Covington's view, to satisfy the "direct physical loss" language, Till Metro must allege actual physical damage or alteration of property requiring repairs. [Doc. 27, p. 15]. Because Till Metro pleads no facts showing physical alteration or structural degradation of the property, in Covington's view, Till Metro fails to allege a covered loss. [*Id.*]. Till Metro takes a more expansive view of the "direct physical loss" language. Till Metro argues "direct physical loss of property describes the scenario where businessowners . . . lose the full range of rights and advantages of using or accessing their business property." [Doc. 28, p. 16 (internal quotation marks omitted)]. Both parties cite case law which they argue supports their respective positions.

For example, Covington cites *Goodwill Indus. of Central Oklahoma, Inc. v. Philadelphia Indem. Ins. Co.*, 499 F. Supp. 3d 1098 (W.D. Okla. 2020). In that case, the policy provided "Business Income" coverage for "the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" *Id.* at 1101 (quoting policy). The "'suspension' must be caused by direct physical loss of or damage to property." *Id.* (quoting policy). The policy provided similar coverage for "Extra Expenses" and for interruption by means of "Civil Authority." *Id.*

There, as here, the parties disputed the meaning of "direct physical loss." The insurer argued the language requires a demonstrable, physical alteration of the property. The insured (Goodwill) argued a direct physical loss results when property is rendered unusable for its intended purpose. The court's analysis is worth quoting at length:

> [The insurer's] proffered definition resembles the common use of the terms "direct," "physical," and "loss." The Oklahoma Supreme Court has relied on dictionary definitions to provide the common usage of terms; *see, e.g., U. S. Fid. & Guar. Co. v. Briscoe*, 205 Okla. 618, 239 P.2d 754, 757 (1951), and Merriam-Webster defines "direct" as "proceeding from one point to another . . . without deviation or interruption" or as "stemming immediately from a source," implying that a causal connection must exist. Merriam

Webster, https://www.merriam-webster.com/dictionary/direct (last visited Oct. 29, 2020). "Physical" is defined as "having material existence" or as "relating to material things," and a "loss" is defined as a "deprivation." Merriam Webster, https://www.merriam-webster.com/dictionary/physical (last visited Oct. 29, 2020); Merriam Webster, https://www.merriam-webster.com/dictionary/loss (last visited Oct. 29, 2020). Thus, a direct physical loss results from an actual, or material, deprivation of Plaintiff's property, which closely aligns with [the insurer's] proffered definition explaining that the Policy only covers a "demonstrable, physical *alteration* of the property . . . [which] exclude[s] alleged losses that are intangible."

\* \* \*

Goodwill did not allege a "direct physical loss" under the Policy because it only alleged an intangible loss to its property. Specifically, Goodwill alleged that "[a]s a result of this COVID-19 pandemic, Goodwill sustained direct physical loss of or damage to its property and will continue to sustain direct physical loss of or damage to its property covered by the Policy. . . ." As [the insurer] explains, Goodwill does not describe "how the spread of a communicable disease nationally caused tangible physical loss of or damage to any of [Goodwill's] premises."

In similar insurance coverage cases brought due to COVID-19 closures, district courts have repeatedly held that "direct physical loss" requires showing some "tangible damage." *See, e.g.*, *Turek Enterprises, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 484 F. Supp. 3d 492, 502[] (E.D. Mich. Sept. 3, 2020) (interpreting direct physical loss as requiring "some tangible damage to Covered Property."); *Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, No. 20-CV-03213-JST, 487 F. Supp. 3d 834, 840[] (N.D. Cal. Sept. 14, 2020) ("the damage contemplated by the Policy is physical in nature") (quoting *Philadelphia Parking Auth. v. Fed. Ins. Co.*, 385 F. Supp. 2d 280, 287 (S.D.N.Y. 2005)); *but see Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 478 F. Supp. 3d 794, 802[] (W.D. Mo. Aug. 12, 2020) (finding that the plaintiffs adequately alleged a direct physical loss when they stated that "COVID-19 particles attached to and damaged their property, which made their premises unsafe and unusable."). In *Malaube, LLC v. Greenwich Ins. Co.*, No. 20-22615-CIV, 2020 WL 5051581, at *1 (S.D. Fla. Aug. 26, 2020), the plaintiff had a policy providing business income and personal property insurance. The plaintiff closed its doors due to city-wide orders preventing restaurants from hosting patrons indoors, *id.*, and subsequently sought a declaratory judgment that it suffered a direct physical loss. *Id.* at *6–7. The

district court held that the plaintiff's allegations were insufficient because "interruption in business must be caused by some *physical problem* with the covered property," and the plaintiffs alleged only that the city-wide orders caused its closure. *Id.* at *7 (quoting *Philadelphia Parking Authority*, 385 F. Supp. 2d at 288).

\* \* \*

Alleging a direct physical loss unambiguously requires a showing of tangible damage. Goodwill failed to allege it suffered any tangible damage, and therefore, its claim is subject to dismissal.

*Goodwill*, 499 F. Supp. 3d at 1102-04 (citations to court documents omitted, alterations and emphasis original).

Till Metro argues the *Goodwill* court got it wrong. In its view, requiring tangible damage conflates the meanings of "loss of" and "damage to" in the policy. The policy here states those terms in the disjunctive: "direct physical loss of *or* damage to." [Doc. 6-1, p. 33 (emphasis added)]. Accordingly, Till Metro explains, "direct physical loss" and "direct physical damage" must mean something different and "loss" reasonably includes the loss of the full range of rights of physically using its property.

In *Real Hosp., LLC v. Travelers Cas. Ins. Co. of America*, 499 F. Supp. 3d 288 (S.D. Miss. 2020), the Southern District of Mississippi persuasively rejected this argument. The court explained:

Giving separate effect to "loss" and "damage" in the phrase, "direct physical loss of or damage," only highlights the distinction between "the permanent dispossession of" and "damage." Even if the Policy covers "permanent dispossession" in addition to physical alteration, which the Court concludes that it does, that does not benefit Plaintiff here. Despite the disjunctive phrasing, with the modifying adjectives, the phrases are "direct physical loss of property" or "damage to property." Either way, "property" is involved. The property is either physically lost, *i.e.*, the insured suffers a permanent dispossession of the property, or it is damaged. After all, it is a commercial "property" policy. . . . The Court agrees with this common-sense approach to the wording.

*Real Hosp.*, 499 F. Supp. 3d at 294 (internal citation omitted).

Similarly, in *Equity Planning Corp. v. Westfield Ins. Co.*, __ F. Supp. 3d __, 2021 WL 766802 (N.D. Ohio Feb. 26, 2021), the Northern District of Ohio reasoned:

> The Court must give effect to *all* terms in the context of the Policy language. "Loss" is modified by the terms "direct" *and* "physical." When "direct," "physical," and "loss" are read together with their ordinary meanings, the Court concludes that the Business Income (and Extra Expense) Coverage Form unambiguously covers an immediate material, perceptible harm that leads either to complete destruction or deprivation ("direct physical loss") or partial destruction ("direct physical damage").
>
> [The insured's] interpretation that "direct physical loss" includes economic losses, such as those that [the insured] claims here, stretches the Policy language beyond its plain meaning and requires the Court to read the word "physical" out of the Policy language. The Court may not do so. Additionally, the Policy does not protect against the "physical loss of **use** or damage to property," and the Court also may not read words *into* the Policy language.

*Equity Planning Corp.*, 2021 WL 766802 at *9 (internal citations omitted, emphasis original); *but see Cherokee Nation v. Lexington Ins. Co.*, Case No. CV-20-150, 2021 WL 506271, at *6 (D. Ct. of Cherokee Cty., Okla. Jan. 29, 2021) ("Applying these definitions reveals that the ordinary meaning of the phrase 'direct physical loss' includes the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions.").

This court agrees. Applying Oklahoma law and according the policy language its ordinary plain meaning, "direct physical loss" unambiguously means property must be materially lost, *i.e.*, the insured suffers a permanent dispossession of the property, or damaged to trigger coverage. One federal court in Oklahoma has considered identical policy language.[3] *See Goodwill*, 499 F. Supp.

---

[3] Till Metro points to *Cherokee Nation*, 2021 WL 506271, an Oklahoma state district court decision. But the *Cherokee Nation* court distinguished its case from *Goodwill* because "[s]imply

3d at 1101, 1105. It reached the same conclusion. And courts across the country applying similar law to identical language agree.[4] *See Planet Sub Holdings, Inc. v. State Auto Prop. & Cas. Co.*, Case No. 20-cv-577-BCW, 2021 WL 2394409, at *5 (W.D. Mo. May 19, 2021) ("a direct physical loss requires a showing of an actual change or intrusion on the property"); *Selery Fulfillment, Inc. v. Colony Ins. Co.*, Case No. 20-cv-853, ___ F. Supp. 3d ___, 2021 WL 963742, at *4 (E.D. Tex. March 15, 2021) ("The provision here provides in part that there must be 'direct physical loss of or damage to property.' The provision's focus on 'direct physical loss of' or 'damage to' *property* strongly suggests there must be some tangible, concrete issue with that property." (emphasis original)); *Real Hosp.*, 499 F. Supp. 3d at 294 ("When all of the provisions are read together it makes logical sense that the property that is insured, *i.e.*, the building and/or personal property in or on the building, must first be lost or damaged before Business Income coverage kicks in."); *Malaube,* 2020 WL 5051581, at *7 ("[W]hen we examine the language of the insurance policy, 'direct physical' modifies both 'loss' and 'damage.' That means that any 'interruption in business must be caused by some *physical problem* with the covered property . . . .'" (quoting *Philadelphia Park. Auth.*, 385 F. Supp. 2d at 288); *10E, LLC v. Travelers Indem. Co.,* 483 F. Supp. 3d 828, 835-36 (C.D. Cal. 2020) ("[L]osses from inability to use property do not amount to 'direct physical loss of or damage to property' within the ordinary and popular meaning of the phrase").

---

put, the policy language is not the same." *Id.* at *8. The policy language here is identical to that in *Goodwill*, 499 F. Supp. 3d at 1101.

[4] In its "Notice of Recent Decision" [Doc. 29], Till Metro attaches *In re Society Ins. Co. COVID-19 Business Interruption Protection Ins. Litigation*, ___ F. Supp. 3d ___, 2021 WL 679109 (N.D. Ill. Feb. 22, 2021). This court joins with others that have respectfully disagreed with or distinguished that decision. *See Town Kitchen LLC v. Certain Underwriters at Lloyd's London*, ___ F. Supp. 3d ___, 2021 WL 768273, at *5 (S.D. Fla. Feb. 26, 2021); *Tria WS LLC v. American Auto. Ins. Co.*, ___ F. Supp. 3d ___, 2021 WL 1193370, at *7 n.5 (E.D. Penn. March 30, 2021); *Chief of Staff LLC v. Hiscox Ins. Co., Inc.*, ___ F. Supp. 3d ___, 2021 WL 1208969, at *4 (N.D. Ill. March 31, 2021); *Deer Mountain Inn LLC v. Union Ins. Co.*, 2021 WL 2076218, at *9 (N.D.N.Y. May 24, 2021).

Till Metro argues against this reading by pointing to the use of "loss" elsewhere in the policy. The policy provides that Covington "will pay for the actual **loss** of Business Income." [Doc. 28, p. 14 (emphasis added)]. In Till Metro's view, because "Business Income cannot have actual physical damage or alteration requiring repairs," "loss" cannot be limited to tangible losses and must include the deprivation of use and enjoyment. But "loss," as used in connection with Business Income, is not modified by "direct physical" as it is in connection with property. The modifiers are what matters here—a "direct physical loss" of property requires material alteration, an "actual loss" of Business Income does not.

For these reasons, Till Metro's contention that its loss of use of property due to the COVID-19 governmental closure orders constitutes "direct physical loss" is unavailing.

Till Metro also alleges that the presence of COVID-19 caused direct physical loss of or damage to the covered property. [Doc. 6, p. 8, ¶ 38]. Till Metro cites in support *Studio 417,* 478 F. Supp. 3d 794. In that case, the plaintiffs alleged that "COVID-19 is a physical substance, that it lives on and is active on inert physical surfaces, and is also emitted into the air." *Studio 417*, 478 F. Supp. 3d at 800 (internal quotation marks omitted). "COVID-19 allegedly attached to and deprived Plaintiffs of their property, making it unsafe and unusable, resulting in direct physical loss to the premises and property." *Id.* The court concluded, "[b]ased on these allegations, the Amended Complaint plausibly alleges a 'direct physical loss' based on 'the plain and ordinary meaning of the phrase.'" *Id.* (quoting *Vogt v. State Farm Life. Ins. Co.*, 963 F.3d 753, 763 (8th Cir. 2020)); *see also Elegant Massage*, *LLC v. State Farm Mut. Auto. Ins. Co.*, ___ F. Supp. 3d ___, 2020 WL 7249624, at *10 (E.D. Va. Dec. 9. 2020) ("That is, the facts of this case are similar [to] those where courts found that asbestos, ammonia, odor from methamphetamine lab, or toxic gasses

from drywall, which caused properties [to be] uninhabitable, inaccessible, and dangerous to use, constituted a direct physical loss.").

Other courts persuasively disagree. In *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878 (S.D. W. Va. 2020), the court declined to follow *Studio 417*. The court explained:

> Firstly, while factual allegations drive the analysis of a motion to dismiss, courts are not required to set aside common sense, and neither *Studio 417*, which relied in part on the allegation of presence of the virus, nor the instant case, involve actual allegations of employees or patrons with infections traced to the business. There is a similar risk of exposure to the virus in any public setting, regardless of artful pleading as to the likelihood of the presence of the virus. Secondly, even when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant. Thus, even actual presence of the virus would not be sufficient to trigger coverage for physical damage or physical loss to the property. Because routine cleaning, perhaps performed with greater frequency and care, eliminates the virus on surfaces, there would be nothing for an insurer to cover, and a covered "loss" is required to invoke the additional coverage for loss of business income under the Policy.

*Uncork*, 498 F. Supp. 3d at 883-84.

Similarly, in *R.T.G. Furniture Corp. v. Hallmark Specialty Ins. Co.*, Case No. 20-cv-2323-T-30AEP, 2021 WL 686864 (M.D. Fla. Jan. 22, 2021), the court concluded "the mere presence of the coronavirus on [plaintiff's] property does not constitute physical damage or loss." *Id.* at *3. "[C]ommon sense tells us that COVID-19 is incapable of causing tangible injury to property. COVID-19 is a virus that harms people, not structures." *Id.*

Here, Till Metro alleges that COVID-19 was present in its property. Another court in the Tenth Circuit has addressed the speculative nature of that allegation. *See Promotional Headwear Int'l v. Cincinnati Ins. Co.*, 504 F. Supp. 3d 1191 (D. Kan. 2020). In that case, unlike here, the plaintiff supported its allegation that COVID-19 was present in its property by including in the

complaint health data, studies, and the number of known infections in the county. The court

explained:

> Plaintiff's allegation that the virus likely contaminated its property
> fails to raise a right of relief above the speculative level. The health
> data and studies described in the Complaint do not support the
> conclusory assertion that the virus was present on the surfaces of
> Plaintiff's property, causing its losses. The fact that the virus travels
> through the air and was present in the United States sooner than first
> suspected, does not support the assertion that it likely exists on the
> surfaces of Plaintiff's property. There is a similar risk of exposure to
> the virus in any public setting, regardless of artful pleading as to the
> likelihood of the presence of the virus. The Complaint alleges that
> at the time of filing, there were 403 known infections in Johnson
> County; there is no allegation that any of these infected individuals
> were ever present on Plaintiff's property, or that employees or
> customers came into contact with someone who was infected before
> entering the property. To accept Plaintiff's conclusory assertion
> would be to accept the proposition that any business located in a
> community with COVID-19 infections was likely contaminated
> with the virus. The Court declines to accept this speculative
> assertion, even at the motion to dismiss stage.

*Id.* at 1203 (internal quotation marks and footnotes omitted).

The court also addressed why, even if the virus were present in the property, the presence

of the virus did not constitute a direct physical loss of or damage to property.

> Moreover, even assuming that the virus physically attached to
> covered property, it did not constitute the direct, physical loss or
> damage required to trigger coverage because its presence can be
> eliminated. Much like the dust and debris at issue in *Mama Jo's* [*Inc.
> v. Sparta Ins. Co.*, 823 F. App'x 868 (11th Cir. 2020)], routine
> cleaning and disinfecting can eliminate the virus on surfaces.
> Plaintiff seeks purely economic damages associated with the
> suspension of its operations due to COVID-19; it does not claim
> property damage due to the presence of COVID-19 in its buildings.

*Id.* at 1203-04 (footnotes omitted).

This court agrees with Chief Judge Robinson's reasoning. The court need not accept Till

Metro's conclusory allegation that COVID-19 was present in its property. There are no allegations

that any infected person was present in the property, or that any person became infected at the

property. And, even if COVID-19 were present, it would not constitute a "direct physical loss" because its presence could be eliminated by cleaning.

In sum, Till Metro fails to allege that COVID-19 and the resultant government closure orders caused "direct physical loss" of its property, a prerequisite for Business Income and Extra Expense coverage.

### 2. Civil Authority Coverage

Covington argues Civil Authority coverage also requires "direct physical loss." The BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM provides Civil Authority coverage as follows: "When a **Covered Cause of Loss** causes damage to property other than property at the described premises, we will pay for the actual loss of Business Income you sustain and necessary Extra Expense caused by action of civil authority that prohibits access to the described premises . . . ." [Doc. 6-1, p. 34 (emphasis added)]. In the section entitled "Covered Causes of Loss, Exclusions and Limitations," the form states "See applicable Causes of Loss form as shown in the Declarations." [*Id.*].

In Covington's view, the applicable policy language is contained in the CAUSES OF LOSS – SPECIAL FORM, which provides "[w]hen Special is shown in the Declarations, **Covered Causes of Loss means direct physical loss** unless the loss is excluded or limited in this policy." [*Id.*, p. 44 (emphasis added)]. Till Metro argues the Special Form cannot apply because the Declarations page shows Covered Causes of Loss as blank, not "Special," for Business Income with Extra Expense coverage.

The Declarations page shows as follows:

| Prem. No. | Bldg. No. | Coverage | Limit of Insurance | Covered Causes of Loss | Coinsurance* | Rates | Premium |
|---|---|---|---|---|---|---|---|
| | | **COVERAGES PROVIDED** - Insurance at the described premises applies only for coverages for which a limit of insurance is shown. | | | | | |
| 1 | 1 | Business Personal Property | $100,000 | Special | 80% | 0.828 | $828.00 |
| 1 | 1 | Bus. Income w/ Extra Exp. | $125,000 | | | 0.828 | $1,035.00 |
| 1 | 1 | Tenant's Imp & Betterments | $150,000 | Special | 80% | 0.828 | $1,242.00 |

[Doc. 6-1, p. 16]. "Special" is not shown in the Declarations with respect to "Bus. Income w/ Extra Exp. coverage," and the Civil Authority provision is found in the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM. Covington offers no persuasive argument on this point, only stating that "[t]he word 'special' is shown in the Covington policy's Commercial Property Coverage Part declarations next to the insured property – *i.e.*, the business personal property and tenants' improvements and betterments. When read together with the Business Income (and Extra Expense) coverage provision, loss to the insured property must be caused by 'direct physical loss' as a prerequisite to coverage for lost business income." [Doc. 31, pp. 11-12 (emphasis original)]. Without more, Covington fails to demonstrate that "Covered Cause of Loss," as used in the Civil Authority provision, is defined by the CAUSES OF LOSS – SPECIAL FORM.

However, as Covington points out, Civil Authority coverage requires "damage to property other than property at the described premises." [Doc. 6-1, p. 34]. The "described premises are premises to which this Coverage Form applies," that is, The Vanguard. [*Id.*]. Till Metro fails to allege damage to any property other than The Vanguard. Additionally, Civil Authority coverage requires both of the following:

> **(1)** Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area but are not more than one mile from the damaged property; and
>
> **(2)** The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

[*Id.*]. There are no allegations with respect to the area immediately surrounding any damaged property, apart from The Vanguard. Accordingly, Till Metro fails to state a claim for Civil Authority coverage under the policy. *See Promotional Headwear*, 504 F. Supp. 3d at 1204-05.

### 3. Breach of Covenant of Good Faith and Fair Dealing

Till Metro asserts a bad faith cause of action, alleging Covington breached its duty of good faith and fair dealing "through unreasonable actions and/or omissions underlying the decisions to deny the applicable coverages." [Doc. 6, p. 26, ¶ 117]. But "a determination of liability under the contract is a prerequisite to a recovery for bad faith breach of an insurance contract." *Davis v. GHS Health Maint. Org., Inc.*, 22 P.3d 1204, 1210 (Okla. 2001). Because Covington is entitled to judgment as a matter of law as to coverage under the insurance contract, it is also entitled to judgment on Till Metro's claim of bad faith breach of the insurance contract. *Gillogly v. General Elec. Capital Assur. Co.*, 430 F.3d 1284, 1293 (10th Cir. 2005) (applying Oklahoma law).

### B.    *Pathogen Exclusion*

Covington argues that, even to the extent Till Metro states a claim for coverage, the policy's pathogen exclusion applies. The pathogen exclusion provides that Covington "will not pay for loss or damage caused directly or indirectly by the discharge, dispersal, seepage, migration, release, escape or application of any pathogenic or poisonous biological or chemical materials." [Doc. 6-1, p. 64]. Covington argues that the COVID-19 virus fits the definition of a "pathogenic material" and, as a result, any losses caused by COVID-19 fall under the exclusion. Till Metro disagrees, arguing a reasonable consumer would not understand the term "pathogenic material" to include a virus like COVID-19, and that COVID-19 was not transmitted by "discharge, dispersal, seepage, migration, release, escape or application."

As noted above, "[t]he Oklahoma Supreme Court has relied on dictionary definitions to provide the common usage of terms." *Goodwill*, 499 F. Supp. 3d at 1102 (citing *U.S. Fid. & Guar.*

*Co.*, 239 P.2d at 757).  Merriam-Webster defines "pathogenic" as "causing or capable of causing disease." Merriam-Webster, www.merriam-webster.com/dictionary/pathogenic (last visited June 23, 2021).  COVID-19 fits easily within this definition, being generally known to cause or to be capable of causing disease.  Accordingly, the ordinary and plain meaning of "pathogenic . . . materials" includes COVID-19.  *See BP America, Inc.*, 148 P.3d at 835 ("When policy provisions are unambiguous and clear, the employed language is accorded its ordinary, plain meaning; and the contract is enforced carrying out the parties' intentions.").  And COVID-19 travels by "discharge," "dispersal," or "release" as "COVID-19 spreads when an infected person breathes out droplets and very small particles that contain the virus.  These droplets and particles can be breathed in by other people or land on their eyes, noses, or mouth."  Centers for Disease Control and Prevention: COVID-19, www.cdc.gov/coronavirus/ 2019-ncov/transmission/index.html (last visited June 23, 2021).  Accordingly, the plain language of the policy's pathogenic materials exclusion excludes losses and damage caused by COVID-19.[5]

### C.  Pollutant Exclusion

Covington also argues the policy's pollutant exclusion precludes coverage for loss or damage caused by COVID-19. But, Till Metro argues that the pollution exclusion is contained in the CAUSES OF LOSS – SPECIAL FORM. As discussed in Section V.A.2, *supra*, Covington fails to establish that the Special form applies to the BUSINESS INCOME (AND EXTRA EXPENSE) COVERAGE FORM. Accordingly, this argument fails.

---

[5] Till Metro also argues that the existence of an industry standard Virus Exclusion—which is not included in Till Metro's policy—weighs against enforcing the Pathogenic or Biological Materials exclusion to exclude losses causes by the COVID-19 virus. However, in the absence of ambiguity, the court is confined to the plain language of the policy.  Because the policy language is unambiguous, the existence of a more specific exclusion does not affect the analysis.

## VI. Conclusion

WHEREFORE, Covington's Motion for Judgment on the Pleadings [Doc. 27] is granted.

Defendant's Motion to Stay Discovery Pending Ruling on Dispositive Motion [Doc. 34] is denied as moot.

IT IS SO ORDERED this 28th day of June, 2021.

GREGORY K. FRIZZELL
UNITED STATES DISTRICT JUDGE